**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**August 16, 2022**

# In the Court of Appeals of Georgia

A22A1111. BC EAV, LLC v. HAVLIK.

PHIPPS, Senior Appellate Judge.

In this dispute over the boundaries of a parcel of developed real property on McPherson Avenue in Atlanta (the "McPherson Property"), plaintiff (and defendant-in-counterclaim) BC EAV, LLC appeals from a trial court order that (a) denied BC EAV's objection to and motion to reject a special master's report and recommendations and (b) thereby effectively granted summary judgment to defendant (and plaintiff-in-counterclaim) Gwendolyn Havlik. On appeal, BC EAV contends that it, rather than Havlik, was entitled to summary judgment. Because the special master and trial court correctly concluded that no disputed issues of material fact remain and that Havlik's predecessor-in-interest acquired prescriptive title to the disputed part of the McPherson Property by adverse possession, we affirm the trial court's rulings.

The record shows that G. M. Wright conveyed the McPherson Property to Jessie and Erby Harper in 1965.[1] The description of the property included in Wright's 1965 warranty deed provides that its northernmost boundary is approximately 94 feet north of McPherson Avenue. In June 1991, the DeKalb County Probate Court issued a Certificate of Order of Year's Support granting Erby Harper's undivided one-half interest in the McPherson Property to Jessie Harper, as Erby Harper's widow. The property's description in the 1991 certificate again provides that its northern boundary is approximately 94 feet north of McPherson Avenue.

In July 1993, a quitclaim deed again granting the McPherson Property to Jessie Harper was executed by an individual identified as Weldon Way. The property description included in Way's quitclaim deed provides that the northernmost property line is approximately 144 feet north of McPherson Avenue. Neither party has uncovered any evidence (other than the July 1993 quitclaim deed) that Way ever held any interest in the McPherson Property or in the 50-foot-wide tract between 94 feet and 144 feet north of McPherson Avenue (the "50-Foot Extension").

In April 2003, Michael and Patrick Mock bought the McPherson Property from the executor of Jessie Harper's estate. The property description included in the April

---

[1] Erby Harper at times is referred to in the record as "Kirby" Harper.

2003 executor's deed provides that the northern boundary of the property is approximately 144 feet north of McPherson Avenue. John Fay bought the McPherson Property from the Mocks in May 2005. The property description attached to the Mocks' May 2005 warranty deed again provides that the northernmost property line is approximately 144 feet north of McPherson Avenue. A property description attached to a security deed executed by Fay at that time similarly provides that the northern boundary is approximately 144 feet north of McPherson Avenue. Fay erected a fence enclosing his backyard — including the 50-Foot Extension — sometime before December 2008. The fence — which is visible from McPherson Avenue — has remained in place since then.

Havlik bought the McPherson Property from Fay in April 2017. The property description attached to Fay's April 2017 limited warranty deed (the "2017 Limited Warranty Deed") again provides that the northernmost property line is approximately 144 feet north of McPherson Avenue.

In October 2019, BC EAV entered into a purchase and sale agreement to buy nine parcels of property in Atlanta from R.E.M.A. US Investments, LLC. The transaction was completed in January 2020. One of the parcels, with a parcel number ending in "074," overlaps the 50-Foot Extension in the McPherson Property.

3

In March 2020, BC EAV sued Havlik, asserting claims for a declaratory judgment, quiet title, and trespass and injury to real estate. BC EAV sought, in relevant part: (i) a declaration that the conveyance of the 50-Foot Extension to Havlik is ineffectual; (ii) a cancellation of the 2017 Limited Warranty Deed; (iii) a decree in equity ordering Havlik to remove all encroachments upon BC EAV's property; and (iv) submission of the case to a special master. Havlik answered, asserted a counterclaim for adverse possession under color of title, and also sought the appointment of a special master. The trial court thereafter appointed a special master to, inter alia, prepare a report and recommendation for the court's consideration.

Following discovery, BC EAV moved for summary judgment, contending that Havlik cannot establish that she acquired prescriptive title to the 50-Foot Extension via adverse possession because neither she nor her predecessor-in-title ever had a legitimate claim of right to the property, as both Havlik and Fay had actual and constructive knowledge that the 50-Foot Extension was not a part of the McPherson Property. Havlik also moved for summary judgment, asserting with respect to her adverse possession claim, as relevant to this appeal, that she and Fay both took title to the McPherson Property (including the 50-Foot Extension) in good faith, with no notice of forgery or fraud.

4

The special master issued a detailed report recommending that Havlik's motion for summary judgment be granted and that BC EAV's motion be denied. BC EAV thereafter filed objections to and a motion to reject the report and recommendations, which the trial court denied, thereby effectively granting summary judgment to Havlik and denying summary judgment to BC EAV. This appeal followed.

"We review de novo a grant or denial of summary judgment, viewing the evidence and all reasonable conclusions and inferences drawn from it in the light most favorable to the nonmovant." *Henry v. Griffin Chrysler Dodge Jeep Ram*, 362 Ga. App. 459, 460 (868 SE2d 827) (2022).

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. The burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the movant meets this burden, the nonmovant cannot rest on his pleadings, but rather must point to specific evidence giving rise to a triable issue.

Id. at 460-461 (citations and punctuation omitted); see OCGA § 9-11-56 (c), (e). In that vein, "speculation which raises merely a conjecture or possibility is not sufficient to create even an inference of fact for consideration on summary judgment." *Ellison*

*v. Burger King Corp.*, 294 Ga. App. 814, 819 (3) (a) (670 SE2d 469) (2008) (citation and punctuation omitted). "Because this opinion addresses cross-motions for summary judgment, we will construe the facts in favor of the nonmoving party as appropriate." *Plantation at Bay Creek Homeowners Assn. v. Glasier*, 349 Ga. App. 203, 204 (825 SE2d 542) (2019) (citations and punctuation omitted).

In two related enumerations of error, BC EAV contends on appeal that the trial court erred by granting summary judgment to Havlik and denying summary judgment to BC EAV. According to BC EAV, Havlik cannot establish title by prescription to the 50-Foot Extension via adverse possession under color of title because any possible claim to the extension "originated in fraud," and, BC EAV argues, Fay therefore "had no good faith claim of ownership" of the extension when he took possession of the McPherson Property. We disagree.

"Title by prescription is the right to property which a possessor acquires by reason of the continuance of his possession for a period of time fixed by law." OCGA § 44-5-160. Under OCGA § 44-5-161 (a), a party may establish prescriptive title by adverse possession where the possession: (i) is "in the right of the possessor and not

6

of another"; (ii) did not originate in fraud, except as provided in OCGA § 44-5-162;[2] (iii) is "public, continuous, exclusive, uninterrupted, and peaceable"; and (iv) is "accompanied by a claim of right." Accord *Simmons v. Community Renewal & Redemption*, 286 Ga. 6, 6 (1) (685 SE2d 75) (2009); *Ga. Power Co. v. Irvin*, 267 Ga. 760, 761-762 (1) & n. 2 (482 SE2d 362) (1997). And under OCGA § 44-5-164, "[p]ossession of real property under written evidence of title in conformance with the requirements of Code Section 44-5-161 for a period of seven years shall confer good title by prescription to the property" (with exceptions not relevant here), unless "the written title is forged or fraudulent and . . . the person claiming adverse possession had actual notice of such forgery or fraud when he commenced his possession."

Moreover, "[p]rescriptive title may be obtained by tacking on successive possession in the chain of title . . . ." *Nebb v. Butler*, 257 Ga. 145, 145 (357 SE2d 257) (1987); see OCGA § 44-5-172 ("An inchoate prescriptive title may be transferred by a person in possession to his successor so that successive possessions may be tacked to make out the prescription."). Adverse possession under color of title

---

[2] OCGA § 44-5-162 provides that "(a) [i]n order for fraud to prevent the possession of property from being the foundation of prescription, such fraud must be actual or positive and not merely constructive or legal"; and "(b) [w]hen actual or positive fraud prevents or deters another party from acting, prescription shall not run until such fraud is discovered."

therefore may be established by showing that one or more predecessors-in-interest satisfied all of the requirements of OCGA § 44-5-164 for the requisite seven-year period. See *Wisenbaker v. Warren*, 196 Ga. App. 551, 553-554 (3) (396 SE2d 528) (1990).

For purposes of adverse possession, the concept of "color of title" entails "a writing upon its face professing to pass title, but which does not do it, either from want of title in the person making it, or from the defective conveyance that is used — a title that is imperfect, but not so obviously so that it would be apparent to one not skilled in the law." *Ponder v. Ponder*, 275 Ga. 616, 619 (2) (571 SE2d 343) (2002) (citation and punctuation omitted). Thus, "[t]o entitle the possessor to the benefit of his color of title, there must be a writing[,] it must purport to convey the property to the possessor[,] it must contain such a description of the property as to render it capable of identification, and the possessor must in good faith claim the land under it." *Irvin*, 267 Ga. at 765 (1) (c) (citation, punctuation, and emphasis omitted). For example, "a quitclaim deed, taken in good faith, is within itself sufficient color of title upon which to base prescription." *Miles v. Blanton*, 211 Ga. 754, 758 (88 SE2d 273) (1955).

If a person buys land in good faith, believing he is obtaining a good title, and enters into possession thereof, and remains there continuously, uninterruptedly, peaceably, etc. for seven years, that possession ripens into a good title, whether the title he purchased originally was good or not. The very object of the doctrine of prescription is to make a bad title good when the necessary requisites have been complied with. When an adverse possessor has held for the requisite period and his prescriptive title ripens, it extinguishes all other inconsistent titles and itself becomes the true title.

*Barfield v. Vickers*, 200 Ga. 279, 281 (36 SE2d 766) (1946) (citations and punctuation omitted).

Because good faith is a prerequisite to acquiring title by prescription under color of title pursuant to OCGA § 44-5-164, "one holding possession under color of title, *which he knows was fraudulently procured*, can not acquire prescriptive title regardless of the period of time such possession is held." *Armour v. Peek*, 271 Ga. 202, 203 (2) (517 SE2d 527) (1999) (citation and punctuation omitted, emphasis supplied). Thus, for fraud to "vitiate the good faith requirement and prevent the running of the period of prescription," it must be "not legal but moral fraud," i.e., "a consciousness of doing wrong." *Ponder*, 275 Ga. at 619 (2) (citation and punctuation omitted). In other words, "[t]o defeat prescriptive title, the fraud of the party claiming

9

thereunder must be such as to charge his conscience. He must be cognizant of the fraud, not by constructive but by actual notice." Id. (citation and punctuation omitted); see OCGA § 44-5-162 (a).

Notably, "[d]irect evidence of bona fides is not required. A presumption of good faith arises from adverse possession." *Barfield*, 200 Ga. at 281 (citations and punctuation omitted); accord *Childs v. Sammons*, 272 Ga. 737, 739 (2) (534 SE2d 409) (2000) (good faith is presumed absent evidence that the claim of possession originated in fraud); *Chancey v. Ga. Power Co.*, 238 Ga. 397, 398 (1) (233 SE2d 365) (1977) ("possession originating in fraud will not be presumed"); see also OCGA § 44-5-162 (a); *Goodrum v. Goodrum*, 283 Ga. 163, 163 (657 SE2d 192) (2008) ("a person who claims title by virtue of adverse possession under color of title must have actual notice of any alleged fraud before that fraud will defeat his adverse possession claim"). In that regard, a deed purporting to convey fee simple title constitutes sufficient color of title for purposes of acquiring title by prescription, even if, unknown to the parties at the time of the transaction, the grantor did not own the property. See *Gigger v. White*, 277 Ga. 68, 70-71 (1) (586 SE2d 242) (2003).

The burden of establishing prescriptive title by adverse possession lies on the party claiming it, *Kelley v. Randolph*, 295 Ga. 721, 722 (1) (763 SE2d 858) (2014),

10

whereas the burden of establishing fraud is on the party opposing adverse possession, *Barfield*, 200 Ga. at 281. Whether adverse possession has been established is a mixed question of law and fact: the underlying facts constituting adverse possession generally are to be decided by the factfinder, whereas whether the proven (or, in this case, undisputed) facts constitute adverse possession is a question of law for the court. See *Irvin*, 267 Ga. at 766 (2).

1. BC EAV's contention that Fay "had no good faith claim of ownership" of the 50-Foot Extension when he took possession of the McPherson Property because any such claim "originated in fraud" is misplaced because there is no record evidence that Fay had actual knowledge of any alleged fraud. The 2005 warranty deed executed by the Mocks, which includes the 50-Foot Extension in the property description, constitutes "color of title" for purposes of adverse possession. See *Ponder*, 275 Ga. at 619 (2); *Irvin*, 267 Ga. at 765 (1) (c). In an attempt to establish a disputed factual issue as to whether Fay had actual knowledge that the color of title was fraudulently procured, BC EAV highlights a survey of the McPherson Property attached to the Seller's Property Disclosure Statement that the Mocks provided to Fay in 2005. The survey — the date of which is illegible — identifies the property owner as one

11

"Edward L. Mauldin"[3] and depicts an L-shaped structure and a smaller, rectangular structure on a lot that extends approximately 94 feet north of McPherson Avenue. When viewed in context with the entirety of the disclosure, it is apparent that the survey was provided for the primary purpose of showing the outline of the original structure, to which the Mocks had added approximately 350 square feet.

Moreover, the documents attached to the Mocks' disclosure statement also included a second, undated survey of the McPherson Property that identifies Jessie Harper as the client and includes the 50-Foot Extension within the property's boundaries.[4] And in the body of the disclosure statement, the Mocks marked the space designated for "No" in response to the question "Are you aware of any encroachments, unrecorded easements, or boundary line disputes with respect to the Property?" When viewed in their entirety — and pretermitting whether there is any

_____

[3] Given that Mauldin does not appear in either of the chains of title identified by the parties (and discussed above), the survey identifying him as the property owner most likely occurred before G. M. Wright conveyed the McPherson Property to Jessie and Erby Harper in 1965.

[4] According to the special master, the parties agree that the Jessie Harper survey was prepared in 2001. That survey also depicts a dashed line at the site of the original northern boundary line, with the abbreviation "IPF" at either end of the dashed line. Neither party points to any record evidence shedding any light on these markings in their appellate briefs.

12

record evidence indicating that title to the 50-Foot Extension in fact may have been procured by fraud — the disclosure statement and its attachments, at best, give rise only to a speculative inference that Fay had the required *actual notice* of any such fraud. "And where, as here, an inference is founded on speculation, it is without evidentiary value," because "[i]nferences must be based on probabilities rather than mere possibilities." *Handberry v. Manning Forestry Svcs.*, 353 Ga. App. 150, 158 (1) (836 SE2d 545) (2019) (citation and punctuation omitted). Rather, "when a party relies on inferences to prove a point, not only must those inferences be factually based, they must tend in some proximate degree to establish the conclusion sought and render less probable all inconsistent conclusions." Id. (citation and punctuation omitted). Consequently, the Mauldin survey is insufficient to give rise to a disputed factual issue with respect to whether Fay had actual notice that title to the 50-Foot Extension was procured by fraud.

2. BC EAV also contends that Fay "had actual knowledge of these title issues in 2006," based on communications in which he engaged with his title insurance provider after he saw one or more red survey flags posted in his backyard at that time. But pretermitting whether those events were sufficient to put Fay on notice of a potential boundary line issue, the relevant question is whether he "had actual notice

13

of [a] forgery or fraud *when he commenced his possession*." OCGA § 44-5-164 (emphasis supplied); see *Childs*, 272 Ga. at 739 (2) (good faith is presumed absent evidence that the claim of possession *originated* in fraud); *Barfield*, 200 Ga. at 281 (possession may ripen into good title "[i]f a person *buys land in good faith*") (citations and punctuation omitted, emphasis supplied). Because anything Fay may have learned about a potential boundary issue after 2005 is irrelevant to the question of whether his claim originated in actual fraud, this contention does not impact the outcome here.

3. In what appears to be an alternative argument, BC EAV maintains that neither Havlik nor Fay can establish a good faith claim to the 50-Foot Extension because there are disputed issues of material fact with respect to whether Fay had actual knowledge of the boundary discrepancy. For the reasons discussed above, however, whether Fay may have known of a potential boundary line discrepancy when he acquired the McPherson Property is immaterial absent record evidence from which a factfinder could conclude that he "had actual notice of [a] *forgery or fraud when he commenced his possession*." OCGA § 44-5-164 (emphasis supplied); see *Childs*, 272 Ga. at 739 (2); *Barfield*, 200 Ga. at 281. As a result, this claim similarly does not impact our rulings here.

14

4. We also disagree with BC EAV's contention that our decision in *Ponder*, 275 Ga. 616, is dispositive of the outcome in this case. In *Ponder*, we concluded that issues of fact remained with respect to whether the parties claiming adverse possession (a) "took possession with implied knowledge that there was a tenancy in common with [another claimant] as a joint heir" of the prior owner, id. at 618 (1), and (b) "swore falsely to [a] petition for no administration" of the prior owner's estate by failing to disclose all known heirs, "and thus lacked the requisite good faith for their claim to ripen into prescriptive title," id. at 619 (2). Setting aside the fact that our decision in *Ponder* required application of a statute governing cotenancies, see OCGA § 44-6-123; *Ponder*, 275 Ga. at 618 (1) — an issue not present here — disputed issues of fact remained in *Ponder* with respect to whether the parties claiming adverse possession took possession via fraud. See 275 Ga. at 619 (2). Here, however, the record evidence gives rise only to a speculative inference that Fay had actual notice of any potential fraud in the acquisition of the 50-Foot Extension. See Division 1, above. Our rulings in *Ponder* therefore have no application to the facts in this case.

5. BC EAV further asserts that Fay's and Havlik's failure to pay property taxes on the 50-Foot Extension also shows the absence of good faith. But even if neither

15

Fay nor Havlik has paid property taxes on the 50-Foot Extension, BC EAV points to no record evidence establishing that Fay knew, when he acquired the McPherson Property, that the taxes being assessed for the property did not account for the 50-Foot Extension, much less that any such knowledge would be sufficient to establish actual knowledge of fraud in the acquisition of the extension. See OCGA § 44-5-164; *Childs*, 272 Ga. at 739 (2); *Barfield*, 200 Ga. at 281. Consequently, this contention also has no bearing on our decision.

6. Finally, we note that BC EAV does not contend that any disputed issues of material fact remain with respect to whether Fay's and Havlik's possession was "public, continuous, exclusive, uninterrupted, and peaceable," OCGA § 44-5-161 (a) (3), and under color of title for the requisite seven-year period, see OCGA § 44-5-164. We therefore affirm the grant of summary judgment to Havlik on these issues.

For each of the above reasons, BC EAV has not met its burden of showing that the trial court erred when it granted summary judgment to Havlik and denied summary judgment to BC EAV, and we affirm the trial court's rulings.

*Judgment affirmed. Doyle, P. J., and Reese, J., concur.*

16